DOUGLAS C. SMITH, #10805
JESSE A. FREDERICK, #12514
CHRISTINA PETRIA, #19047
**LEWIS BRISBOIS BISGAARD & SMITH LLP**
6550 South Millrock Drive, Suite 200
Salt Lake City, Utah 84121
Telephone: 801.562.5555
Facsimile: 801.562.5510
Douglas.Smith@lewisbrisbois.com
Jesse.Frederick@lewisbrisbois.com
christina.petria@lewisbrisbois.com

*Attorneys for Plaintiff Larada Sciences, Inc.*

---

## IN THE UNITED STATES DISTRICT COURT
## IN AND FOR THE DISTRICT OF UTAH

| | |
|---|---|
| Larada Sciences, Inc. d/b/a Lice Clinics of America, <br><br> Plaintiff, <br><br> v. <br><br> The MIH Group, LLC, <br><br> Defendant. | **COMPLAINT FOR DECLARATORY JUDGMENT AND EQUITABLE RELIEF** <br><br> Case No.:  2:24-cv-00414-TS <br><br> Judge Ted Stewart |

Plaintiff, Larada Sciences, Inc. d/b/a Lice Clinics of America ("LCA"), by and through its undersigned attorneys, seeks a declaration of rights under Rule 57 of the Federal Rules of Civil Procedure and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq.*, that the parties' Franchise Agreements, the Consulting Agreement, and the Modification Agreements are valid and enforceable against Defendant, The MIH Group, LLC ("MIH"), with respect to their contractual provisions preventing (1) The MIH Group, LLC from competing with LCA's business, and (2)

disseminating LCA's Proprietary Information, trade secrets, and goodwill as more fully set forth and described herein, as well as other relief prayed for herein.

## INTRODUCTION

1.      This is a civil action for declaratory judgment under Fed. R. Civ. P. 57, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq.*  The matter in controversy exceeds the sum or value of seventy-five thousand dollars ($75,000.00), exclusive of interest and costs.  As will be described herein, LCA seeks:

    a.  a declaration that the parties' Franchise Agreements, the Consulting Agreement, and the Modification Agreements are valid and enforceable against MIH with respect to their contractual provisions preventing MIH from competing with LCA's business; and

    b.  a declaration that the parties' Franchise Agreements, the Consulting Agreement, and the Modification Agreements are valid and enforceable against MIH with respect to their contractual provisions preventing the disseminating of LCA's Proprietary Information, trade secrets, and goodwill; and

    c.  Such other and further relief as the Court deems necessary, proper and just under the circumstances.

## PARTIES, JURISDICTION AND VENUE

2.      LCA is a corporation organized under the laws of Delaware and with its principal place of business in Salt Lake County, State of Utah.  For diversity purposes, LCA is domiciled in the States of Delaware and Utah.

3.      LCA is a franchisor with approximately 125 franchisee-owned lice treatment clinics in the United States.

4.      LCA has its corporate headquarters and one corporate-owned lice treatment clinic in Utah.

5.      LCA has been recognized as a registered franchisor in all 50 states since 2018.

6.      LCA manufactures and markets devices, products, and services for the treatment of head lice and it grants franchises to others to use its devices, products, and services in the operation of independent head-lice-treatment clinics pursuant to franchise agreements.

7.      Prior to its registration as a franchisor in all 50 states, LCA had established license agreements for use of proprietary technology and equipment.

8.      Once LCA became a registered franchisor in 2018, all agreements between LCA and its licensees, whether original license agreements or modifications thereto, became franchise agreements and are subject to franchise regulations.

9.      Upon information and belief, MIH is a Michigan limited liability company, with its principal place of business in Ann Arbor, Michigan.  MIH may be served with process through its registered agent, Michael Brehm, at 4075 Yarrow Drive NE, Grand Rapids, Michigan 49525.

10.     Upon information and belief, MIH's members are comprised of individuals residing in the State of Michigan.  Therefore, upon information and belief and for diversity purposes, MIH is domiciled in the State of Michigan.

11.     MIH has consented to personal jurisdiction and venue in Salt Lake County, Utah pursuant to its Consulting Agreement, Franchise Agreements and Modification Agreements (all defined below) between LCA and MIH.

12.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1332, 2201, and 2202 because an actual controversy exists between citizens of different states

concerning the enforceability of non-compete and dissemination of trade secret provisions in their respective agreements, in excess of the sum of $75,000.00, exclusive of interest and cost.

13.     This Court has personal jurisdiction over MIH pursuant to Utah's long-arm statute, Utah Code § 78B-3-205(2) pursuant to a Consulting Agreement between LCA and MIH and the forum-selection clause of the Franchise Agreements and Modification Agreements entered into between LCA and MIH.

14.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391, as MIH is subject to the Court's personal jurisdiction in this venue pursuant to the forum-selection clause of the Franchise Agreements, Consulting Agreement, and Modification Agreements entered into between LCA and MIH.

## GENERAL ALLEGATIONS

15.     In 2011, The Lice Brigade, LLC, a Michigan limited liability company, entered into license agreements with LCA to operate its Michigan lice treatment clinics (named Rapunzel's Lice Boutiques) which clinics MIH subsequently purchased.

16.     As noted above, when LCA became a registered franchisor, all agreements between LCA and MIH became franchise agreements.

17.     The franchise agreements between LCA and Lice Brigade were valid and enforceable at the time that MIH purchased the Michigan Rapunzel's Lice Boutique locations from Lice Brigade, and subsequently MIH then entered into additional license agreements, franchise agreements and modification agreements with LCA.

18.     MIH currently operates eight (7) LCA-franchised lice treatment clinics: five (5) in Michigan, one (1) in Ohio, and one (1) in Florida.

19.     Commencing on or about July 1, 2014, MIH entered into a series of license agreements (now franchise agreements) with LCA, which allowed MIH to use LCA's devices, products, and services at numerous clinics in defined locations in Michigan and Ohio (the "Franchise Agreements").  A sample of one such Franchise Agreement has been attached hereto as **Exhibit A**.  Following the execution of the 2014 Franchise Agreements, MIH operated LCA locations, which LCA allowed to be co-branded as "Lice Clinics of America operated by Rapunzel's Lice Boutique."

20.     In other words, MIH operated using LCA devices, products, and services in its preexisting locations in Michigan and Ohio.

21.     As a licensee of LCA, MIH has access to proprietary information and equipment, marketing materials, training materials, and other copyrighted and privileged information ("Proprietary Information").

22.     The Franchise Agreements provide, among other things, the following:

**7.     Definitions:**

\*   \*   \*

g.     "Client" shall refer to the recipient of the Treatment supplied by [MIH].

\*   \*   \*

s.     "Incurable Default" shall have the meaning given to it in paragraph 13 and elsewhere in this Agreement.

\*   \*   \*

ab.     "Proprietary Information" shall have the meaning given to it in paragraph 10 below.

\*   \*   \*

ag.    "Treatment" shall mean any and all treatments for head lice delivered to a Client by a Certified Operator using the Device.

\*   \*   \*

**10.    Proprietary Information and Innovation**

a.    For purposes of this Agreement, "Proprietary Information" includes but is not limited to:

i.    The Device and the construction of, and the design, mechanics, patents, electronics, User Manuals, Consumables and all other parts that make up the Device;

ii.    All Documents;

iii.    The Marks as they may be added, changed or deleted from time to time;

iv.    The operating procedures and processes used to deliver the Treatment to the Client.

v.    All common law rights to the Marks and to any copyrighted materials; and

vi.    Any trade secret processes, formulae or information of a similar nature deemed to be a "trade secret" as that term is defined by the Uniform Trade Secret Act of Utah as found at Title 13, Chapter 24 of the Utah Code.

b.    During the term of this Agreement and following its expiration or termination for any reason, [MIH] agrees that without [LCA]'s prior written consent, which consent may be granted or denied for any reason or for no reason, it shall not: (i) divulge, directly or indirectly, orally or in writing or electronically, to any person or entity, any component of the Proprietary Information except such operating procedures and processes so used to deliver treatment to the Client; or, (ii) disassemble, reverse engineer, or otherwise copy any component of the Device or any Consumable; or (iii) otherwise take any action that may be commercially reasonably deemed to be an infringement upon any common law or statutory exclusive rights in favor of [LCA].

\*   \*   \*

d.      [MIH] agrees that [LCA] owns all of the right, title and interest in and to each component of the Proprietary Information. Nothing herein shall be construed as granting [MIH] any right, title or interest in or to any component of the Proprietary Information except as described herein. To the extent that this Agreement is deemed to grant the [MIH] a license to operate using any component of the Proprietary Information, such license is non-exclusive, and temporary as described herein.

e.      [MIH] does have a limited right to disclose Proprietary Information only to such [MIH] Parties as must have access to it in order to operate the Device, prepare reports or to take action in furtherance of the covenants of this Agreement. [MIH] shall obtain from each such [MIH] Party an agreement that such person shall not during the course of his employment, representation, or agency with [MIH], or at any time thereafter, use, divulge, disclose, or communicate, directly or indirectly, in any form or manner, to any person or business entity any component of the Proprietary Information.

                        *   *   *

g.      [MIH] will promptly notify [LCA] in writing of any possible infringement on or use by others of any component of the Proprietary Information. . . . [MIH] must reasonably cooperate with [LCA] in any way necessary to protect such rights . . . .

                        *   *   *

i.      Any and all goodwill associated with any component of the Proprietary Information (including but not limited to the Marks and the Device), including any goodwill that might be deemed to have arisen through [MIH]'s activities related to the Device and excluding [MIH]'s activities not associated with the Device as described herein, shall inure directly and exclusively to the benefit of [LCA] and not to the [MIH]:

j.      [MIH] further agrees to:

        i.      Fully and strictly adhere to all reasonable security procedures prescribed by [LCA] for maintaining the secrecy of Proprietary Information;

        ii.     Refrain from using any component of Proprietary Information in any other business or in any manner not specifically authorized or approved by  [LCA] in writing; and,

iii.     Exercise the highest degree of diligence and make every effort to maintain the absolute confidentiality of all such information during and after the term of this Agreement.

\*   \*   \*

### 13. Default, Termination, Surrender and Remedies

a.     Subject only to Force Majeure, effective upon receipt of written notice, said notice presented to [MIH] in accordance with Section 18 below, [LCA] may terminate this Agreement without providing the [MIH] any right to cure upon the occurrence of any one or more of the following events (each of which event is deemed to be an "Incurable Default"):

\*   \*   \*

iv.     [MIH] uses any component of the Proprietary Information in violation of this Agreement, or otherwise negligently or intentionally discloses any component of the Proprietary Information in violation of this Agreement.

\*   \*   \*

c.     Upon termination of this Agreement by either Party as permitted herein . . . [LCA] shall have such additional rights as may be necessary, including the right to obtain injunctive relief in order to insure that the [MIH] ceases to deliver Treatments using the Device and ceases to use any component of the Proprietary Information.

\*   \*   \*

e.     No right or remedy herein conferred upon or reserved to [LCA] or [MIH] is exclusive of any other right or remedy available under this Agreement or by law or equity, but each shall be cumulative of every other right or remedy given hereunder or now or hereafter existing at law, in equity or by statute of otherwise. Any such remedy may be enforced concurrently therewith or from time to time.

23.     The Franchise Agreements further provide, among other things, the following:

### 15.     Indemnification

a.      [MIH] shall indemnify, defend and save [LCA] and all [LCA] Parties harmless from any and all claims, causes of action, damages, awards, losses, fees (including reasonable attorney's fees, expert witness fees, court costs and the like), injury, repair, replacement or maintenance costs, audit costs, quality control expenses and costs, or any loss from whatever cause (Claim) resulting from [MIH]'s: . . . (v) [MIH]'s violation of any term, covenant or condition of this Agreement.

*   *   *

**18. Miscellaneous Provisions.**

*   *   *

f.      Any provision, term, covenant or condition of this Agreement that by its terms must extend beyond termination or expiration of this Agreement in order to remain enforceable shall continue in full force and effect subsequent to and notwithstanding the termination or expiration of this Agreement.

*   *   *

o.      In the event that either Party brings an action in reference to this Agreement, the "Prevailing Party" in such action shall be awarded all reasonable attorneys' fees, expert witness fees, court costs and discovery costs incurred. For the purposes of this Agreement, the Prevailing Party shall be deemed that Party that has prevailed on a majority of the issues decided by the trier of fact, law or equity.

24.     On or about December 31, 2015, MIH entered into a Consulting Agreement (the "Consulting Agreement") with LCA.  A copy of the Consulting Agreement has been attached hereto as **Exhibit B**.

25.     Like the Franchise Agreements, the Consulting Agreement provides, among other things, the following:

7.      **Proprietary Information and Inventions; Restrictions on Competition and Solicitation; Non-Disparagement**. The relationship between [LCA] and [MIH] is one of confidence and trust. The parties agree that the provisions of this Section 6 are fair and reasonable because, as a result of the Services under this

Agreement, [MIH] will have access to confidential and proprietary information of [LCA] and each Client Company, and that such information is a highly valued asset.

7.1     "Proprietary Information" shall mean (a) any information or data that is confidential or proprietary, technical or non-technical information or data of [LCA] or any subsidiary, affiliate or successor of [LCA], including for example and without limitation, information or data that is a [LCA] innovation or is related to any [LCA] Innovations, concepts, techniques, processes, methods, systems, designs, computer programs, source documentation, trade secrets, formulas, development or experimental work, work in progress, financial statements, forecasts, proposed and future products, marketing plans, business plans, pricing policies or lists, operational methods, marketing data, plans or strategies, legal strategies, product development, techniques or plans, customer lists and pricing, and supplier lists and pricing, and any other nonpublic information that may have commercial value and (b) any information or data [LCA] has received from others that [LCA] is obligated to treat as confidential or proprietary, which may be made known to [MIH] by [LCA] or Client Company, a third party or otherwise that [MIH] may learn during the term of this Agreement.

7.1.2.  "Innovations" shall mean all discoveries, designs, developments, improvements, inventions (whether or not protectable under patent laws), works of authorship, information fixed in any tangible medium or expression (whether or not protectable under copyright laws), trade secrets, know-how, idea (whether or not protectable under trade secret laws), mask works, trademarks, service marks, trade names and trade dress.

26.     The Consulting Agreement terminated by its own terms on February 28, 2018.

27.     On or about September 29, 2022, MIH entered into Modification Agreements (the "Modification Agreements") with LCA, wherein LCA agreed to extend the Franchise Agreements and make modifications to the fee structure and other items thereto for the seven (7) Michigan and Ohio territories.  In six (6) of those territories, Ann Arbor, Michigan; Farmington Hills, Michigan; Sterling Heights, Michigan; Toledo, Ohio; Kalamazoo, Michigan; and Grand Blanc, Michigan, MIH operated a lice-treatment clinic.  In one (1) of those territories, Lansing, Michigan, MIH was

not operating a lice business.  A copy of one of the Modification Agreements has been attached hereto as **Exhibit C**.  MIH was also operating lice-treatment clinics in Daytona Beach, Florida and Scottsdale, Arizona and had entered into Franchise Agreements and Modification Agreements with LCA for those locations.

28.     Pursuant to the Modification Agreements, the Franchise Agreements were extended to September 1, 2023.

29.     On October 11, 2023, LCA's Claire Roberts sent an email to MIH's Mike Brehm and Phil Brechting informing them that the terms of their Franchise Agreements had expired, and requesting a call to discuss renewing their territories.

30.     On October 17, 2023 Claire Roberts, along with LCA's Adam Ward, had a call with Mike Brehm and Phil Brechting.  During that call Mike Brehm and Phil Brechting expressed their desire to continue MIH's business relationship with LCA by signing new franchise agreements. Mike Brehm and Phil Brechting were aware that those new franchise agreements would each come with a 5-year term with a 5-year renewal.

31.     On October 19, 2023, Adam Ward sent to Mike Brehm and Phil Brechting an acknowledgement notice that MIH was operating on a month-to-month Interim Period, as defined in the Modification Agreements, until such time as the parties enter into new franchise agreements for the territories, as well as LCA's franchise disclosure document, which MIH would be required to sign prior to entering into the new franchise agreements.

32.     MIH did not enter into new franchise agreements or sign the franchise disclosure documents with LCA.

33.     Pursuant to the Modification Agreements, the Parties acknowledged that they had entered into either a franchise agreement or license agreement (either of which is considered a

Franchise Agreement) wherein MIH was granted the right to use certain "Devices and trademarks" in the respective territories.

34.   The Modification Agreements provide, among other things, the following:

<u>DEFINITIONS</u>

1.   For purposes of this Agreement, the terms below have the following definitions (other terms are either defined throughout the Agreement or are defined in your Franchise Agreement):

\*   \*   \*

o.   "Competing Business" shall mean any clinic or business which competes against [LCA] by providing lice-treatment services and selling related products.

\*   \*   \*

x.   "Franchisee Resource Portal" shall refer to an online system designed to provide you and other members of the network with resources for support, training, reporting, ordering products, access to Operations Manual and User Manual, and other clinic success tools.

\*   \*   \*

z.   "Incurable Default" shall mean any of the incurable defaults specified in your [Franchise Agreement] and modified in this Agreement, if applicable.

\*   \*   \*

aa.   "Interim Period" shall mean a month-to-month period of time, granted at our discretion, between when your Franchise Agreement expires and any renewal agreement is signed by the Parties.

\*   \*   \*

hh.   "Operations Manual" or "Manual" means any collection of written, video, audio and/or software media (including materials distributed electronically), regardless of title and consisting of various subparts and separate components, all of which we or our agents produce and which contain specifications, standards,

policies, procedures, restrictions and recommendations for your LICE CLINICS OF AMERICA Clinic, all of which we may change from time to time.

\*   \*   \*

ll.     "Proprietary Information" shall mean the proprietary and confidential information as defined in your [Franchise Agreement].

\*   \*   \*

qq.     "System" means the LICE CLINICS OF AMERICA System, which consists of lice screening and diagnosis, lice-treatment services, methods of procedures, equipment, equipment layouts, interior and exterior accessories, color schemes, products, services, methods of operation, marketing and advertising programs, management programs, standards, specifications and proprietary information, all of which we may change [sic] modify and change from time to time.

35.     The Modification Agreements further provide, among other things, the following:

<u>OPERATING PROCEDURES</u>

\*   \*   \*

21.     You acknowledge having received access to the Operations Manual via our Franchisee Resource Portal for the Term. The Operations Manual is at all times our sole property. You must at all times treat the Operations Manual, and the information it contains, as secret and confidential, and must be all reasonable efforts to maintain such information as secret and confidential.

\*   \*   \*

<u>WEBSITE, SOCIAL MEDIA AND CALL TRACKING</u>

23.     You may not separately register any domain name containing any of the Trademarks, participate in any website (including any social media platform) that markets goods and services similar to a Lice Clinics of America clinic, or operate a website or social media site for your Clinic that does link to our website and/or that we do not approve.

\*   \*   \*

26.     . . . You acknowledge that certain information related to your participation in our website or intranet system may be considered Proprietary Information, including access codes and identification codes. Your right to participate in our website and intranet or extranet system, or otherwise use the Trademarks or System on the Internet or other online communications, will terminate when the [Franchise Agreement] expires or terminates.

36.     The Modification Agreements further provide, among other things, the following:

## NON-COMPETE COVENANTS

39.     You agree that you will receive valuable training, Proprietary Information and goodwill that you otherwise would not receive or have access to but for the rights licensed to you under the [Franchise Agreement]. You therefore agree to the following non-competition covenants:

\*     \*     \*

b.     You covenant that during the Term or during any Interim Period you will not, except as we otherwise consent to in writing, either directly or indirectly, for yourself, or through, on behalf of, or in conjunction with any person or entity, own, manage, operate, maintain, engage in, consult with or have any interest in any other lice-treatment clinic or business other than the one authorized by this Agreement or any other agreement between us and you.

c.     You covenant that you will not, for a period of two (2) years after the expiration or termination of the [Franchise Agreement], or after the expiration of any Interim Period, regardless of the cause of termination, or within two (2) years of the sale of the Clinic or any interest in you, either directly or indirectly, for yourself, or through, on behalf of, or in conjunction with any person or entity, own, manage, operate, maintain, engage in, consult with or have any interest in a Competing Business:

i.     At the premises of the former Clinic;

ii.     Within ten (10) miles of the outer boundary of the Designated Territory and any Additional Territory that may be listed in this Agreement; or

iii.     Within 5 miles of any other business or clinic using the Lice Clinics of America System, whether franchised or owned by us or our affiliates.

      d.     You agree that the length of time in this non-compete section will be tolled for any period during which you are in breach of the covenants or any other period during which we seek to enforce this Agreement. The parties agree that each of the foregoing covenants will be construed as independent of any other covenant or provision in this Agreement.

37.    During the course of the parties' relationship beginning on or about July 1, 2014, MIH received valuable training, Proprietary Information, trade secrets, and goodwill that it would otherwise not have received or had access to but for the contractual relationships with LCA.

38.    Such valuable training, Proprietary Information, trade secrets, and goodwill included, but is not limited to, online coaching sessions, one-on-one training calls, monthly franchise-wide video calls, and in-person franchise conventions.

39.    Such valuable training, Proprietary Information, trade secrets, and goodwill also included, but is not limited to, LCA's "12 Best Practices," which LCA introduced to MIH after the execution of the Modification Agreements, and which LCA trained MIH on through weekly coaching sessions.

40.    Those 12 Best Practices included training on clinic operations and financial reporting; monitoring of financial and operational key performance indicators; optimal treatment pricing strategies; customer-service phone support; optimal clinic staffing and employee compensation; digital marketing campaigns; targeted marketing outreach programs such as sending out "Lice Alerts," partnering with other agencies in the community, enrolling local teachers, administrators, and school nurses in Lice Clinics of America's "Schools Without Lice" program; and fostering customer loyalty through the adoption of the lice "Protection Plan," positive Google reviews, and customer experience surveys and telephone calls.

41.     LCA's 12 Best Practices were policies and procedures developed by LCA, verifiably improved the performance and success of clinic owners who adopted them, including MIH, and was included in LCA's training following the execution of the Modification Agreements.

42.     Such training was provided to Phil Brechting and MIH by Dwight L. Ottesen, who is a consultant hired by LCA to assist with LCA's coaching of the 12 Best Practices and related processes, technology resources, marketing materials, clinic staffing and employee motivational programs.

43.     Dwight L. Ottesen trained Phil Brechting and MIH on the 12 Best Practices at least once a week following the execution of the Modification Agreements.

44.     LCA's valuable training, Proprietary Information, trade secrets, and goodwill also included, but is not limited to, unique and proprietary products and services; marketing materials; confidential business and professional information; business relationships with current and prospective customers and clients; customer and client lists; specialized training, and specialized policies and procedures; LCA's Internet, intranet, and extranet platforms and information, and the Meevo point-of-sale system ("Meevo") that LCA customized, optimized and trained its franchisees and MIH on for use in their clinics.

45.     From September of 2022 through at least December of 2023, MIH continued to have access to and benefitted from LCA's valuable training, Proprietary Information, trade secrets, and goodwill.

46.     On or about January 9, 2024, MIH sent an email to LCA of its intention to terminate six of their eight Franchise Agreements with LCA within 48 hours and notified LCA that it would

compete with LCA by continuing to operate its Michigan and Ohio lice treatment clinics following its termination of the Franchise Agreements.

47.     Specifically, Phil Brechting of MIH sent an email to LCA wherein he stated that MIH "will not be renewing our contract with [LCA] for six of our shops, and we will largely be discontinuing our business relationship with [LCA] as of January 11, 2024."   A copy of the termination email has been attached hereto as **Exhibit D**.

48.     Mr. Brechting further stated that "[o]ur six shops in Michigan and Ohio will discontinue operating in conjunction with [LCA] and will revert solely to operating as Rapunzel's Lice Boutiques on January 11, 2024. January 10, 2024 will be the last day we will use the Air Alle [sic] machines as well as the Meevo POS."

49.     Mr. Brechting further stated that "[w]e have already overhauled the website and our marketing materials for the Rapunzel's shops so that starting on January 11 we will no longer be co-branding with Lice Clinics of America."

50.     LCA materially complied with its obligations under the Franchise Agreements, the Consulting Agreement, and the Modification Agreements.

## FIRST CAUSE OF ACTION
### (Declaratory Judgment)

51.     LCA incorporates by reference the preceding allegations of this Complaint as though fully set forth herein.

52.     An actual, present, and justiciable controversy exists between LCA and MIH, with respect to the parties' rights and obligations under the Franchise Agreements, the Consulting Agreement, and the Modification Agreements.

53.     LCA and MIH entered into a series of Franchise Agreements beginning on or about July 1, 2014, the Consulting Agreement on December 31, 2015, and the Modification Agreements on September 29, 2022.

54.     The Franchise Agreements, the Consulting Agreement, and the Modification Agreements generally provide that MIH may not compete with LCA's business, directly or indirectly, following the termination or expiration of such agreements, as more fully set forth in the agreements.

55.     The Franchise Agreements, the Consulting Agreement, and the Modification Agreements generally provide that MIH may not disseminate LCA's Proprietary Information, trade secrets, and goodwill following the termination or expiration of such agreements, as more fully set forth in the agreements.

56.     On January 9, 2024, MIH sent an email to LCA of its intention to terminate six of their eight Franchise Agreements with LCA within 48 hours and notified LCA that it would compete with LCA by continuing to operate its Michigan and Ohio lice treatment clinics following its termination of the Franchise Agreements.

57.     MIH's termination email provided that six shops in Michigan and Ohio will discontinue operating in conjunction with LCA and will revert solely to operating as Rapunzel's Lice Boutiques on January 11, 2024.

58.     MIH's termination email further stated that it has already overhauled the website and our marketing materials for the Rapunzel's shops so that starting on January 11, 2024 it would no longer be co-branding with LCA.

59.     Effective January 11, 2024, MIH has begun competing with LCA's business despite their prohibition on doing so under the Franchise Agreements, the Consulting Agreement, and the Modification Agreements.

60.     LCA has been harmed by MIH competing with LCA's business in violation of the Franchise Agreements and Modification Agreements, in an amount to be proven at trial, but not less than $300,000.00 plus interest, costs, and attorneys' fees pursuant to the terms of the Franchise Agreements and Modification Agreements.

61.     Accordingly, LCA is entitled to a declaratory judgment that the Franchise Agreements, the Consulting Agreement, and the Modification Agreements' provisions relating to competing with LCA's business and disseminating LCA's Proprietary Information, trade secrets, and goodwill, as more fully set forth in those agreements, are valid and enforceable.

62.     LCA is further entitled to a declaratory judgment that MIH may not compete with or disseminate LCA's Proprietary Information, trade secrets, and goodwill, as more fully set forth in the Franchise Agreements, the Consulting Agreement, and the Modification Agreements.

## SECOND CAUSE OF ACTION
### (Permanent Injunction)

63.     LCA incorporates by reference the preceding allegations of this Complaint as if fully set forth herein.

64.     LCA and MIH entered into a series of contractually binding Franchise Agreements, the Consulting Agreement, and the Modification Agreements.

65.     LCA performed all of its obligations under the Franchise Agreements, the Consulting Agreement, and the Modification Agreements.

66.     LCA has standing to bring this matter for permanent injunction because of its unique property rights and protectable interests in, among other things, its valuable training, Proprietary Information, trade secrets, and goodwill.

67.     LCA has standing to bring this matter for permanent injunction because of its unique property rights and protectable interests in, among other things, its business, unique and proprietary products and services, trade secrets, confidential business and professional information, business relationships with current and prospective customers and clients, customer and client lists, specialized training, specialized policies and procedures, and its Internet, intranet, and extranet platforms and information.

68.     LCA has standing to bring this matter for permanent injunction because of its unique property rights and protectable interests in, among other things, the non-compete covenants made by MIH.

69.     Legal remedies are inadequate without a permanent injunction being issued.

70.     LCA has suffered and will continue to suffer irreparable harm if a permanent injunction is not issued.

71.     Court enforcement of a permanent injunction is feasible.

72.     LCA merits a permanent injunction after balancing the equities.

73.     MIH must be permanently enjoined from using any of LCA's valuable training, Proprietary Information, trade secrets, and goodwill, including, but not limited to, LCA's unique and proprietary products and services, confidential business and professional information, business relationships with current and prospective customers and clients, customer and client lists, specialized training, and specialized policies and procedures.

74.     MIH must be permanently enjoined for a term of two (2) years following the resolution of this lawsuit pursuant to the Non-Compete Covenants agreed to by MIH in the Modification Agreements.

<u>**SECOND CAUSE OF ACTION**</u>
**(Permanent Injunction)**

75.     LCA incorporates by reference the preceding allegations of this Complaint as if fully set forth herein.

76.     At all times material hereto, LCA has made an unconditional tender to MIH of its performance obligations and has duly performed under the Franchise Agreements, the Consulting Agreement, and the Modification Agreements.

77.     By competing with LCA's business, MIH is in violation of the Franchise Agreements, the Consulting Agreement, and the Modification Agreements, and LCA has been harmed in an amount to be proven at trial, but not less than $300,000.00 plus interest, costs, and attorneys' fees pursuant to the terms of those agreements.

78.     LCA seeks MIH's specific performance under the Franchise Agreements, the Consulting Agreement, and the Modification Agreements by preventing them from competing with LCA's business as described herein such that MIH may precisely fulfill its legal and contractual obligations to LCA.

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE, LCA demands judgment against MIH as follows:

1.     A declaration that that the Franchise Agreements, the Consulting Agreement, and the Modification Agreements' provisions relating to competing with LCA's business and disseminating LCA's Proprietary Information, trade secrets, and goodwill, as more fully set forth in those agreements, are valid and enforceable;

2.      A declaration that MIH may not compete with or disseminate LCA's Proprietary Information, trade secrets, and goodwill, as more fully set forth in the Franchise Agreements, the Consulting Agreement, and the Modification Agreements;

3.      A permanent injunction as more fully described in Count II of this Complaint;

4.      A decree of specific performance requiring MIH to comply with the Franchise Agreements, the Consulting Agreement, and the Modification Agreements and preventing it from competing with LCA's business;

5.      For interest, costs, and attorneys' fees; and

6.      For such other and further relief as may been deemed just, equitable, and proper.

DATED:  June 10, 2024                        **LEWIS BRISBOIS BISGAARD & SMITH LLP**

By:   */s/ Douglas C. Smith*
         Douglas C. Smith
         Jesse A. Frederick
         Christina Petria
         *Attorney for Plaintiff Larada Sciences, Inc.*